J-S40015-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| ESTATE OF: JOHN LESLIE RUPERT, A/K/A JOHN L. RUPERT, LATE OF PENNSBURY, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: BRYAN J. BOARDMAN | No. 2924 EDA 2015 |

Appeal from the Order June 25, 2015
In the Court of Common Pleas of Chester County
Orphans' Court at No(s): 1513-0131

BEFORE: BOWES, MUNDY AND MUSMANNO, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED AUGUST 18, 2016**

On appeal, Bryan J. Boardman challenges the propriety of the orphans' court's denial of a claim that he made against the Estate of John Leslie Rupert. We affirm.

On January 11, 2013, John Leslie Rupert died testate. On January 23, 2013, the Register of Wills of Chester County probated his last will and testament and issued letters testamentary to C. Barry Buckley. At the time of his death, Mr. Rupert owned a one-half interest in property located at 137 McFadden Road, Pennsbury Township, Chadds Ford ("the real estate"). Appellant possessed an option to purchase the decedent's one-half interest in the real estate, and it had to be exercised within six months of Mr.

Rupert's death. After the six-month period expired, and the option was not exercised, Mr. Buckley deeded Mr. Rupert's interest in the real estate to the beneficiaries under the will.

Appellant, who has proceeded *pro se* throughout these proceedings, thereafter filed a claim against the estate, petitioning for payment of $217,572.89. His claim encompassed these four positions: 1) Appellant was the sole owner of the real estate; 2) the estate was liable to Appellant for rental paid to Mr. Rupert by two people who had trailers on the property as well as for rental that Mr. Rupert owed Appellant based upon the fact that Mr. Rupert alone occupied the real estate while he lived; 3) the estate was liable to Appellant for waste occasioned by Mr. Rupert's use of the real estate; and 4) Appellant owned all of the personal property of decedent by virtue of an agreement of sale executed by Mr. Rupert. After a hearing, the claim was denied in its entirety.

Mr. Buckley filed an account, and Appellant filed exceptions. After those exceptions were denied, Appellant filed the present appeal wherein he raises these issues:

> 1. Did the Orphans' Court commit an error of law or otherwise abuse its discretion when it found, at the time of Property purchase, Mr. ("Boardman") and Mr. ("Rupert") held equal shares in the Property and that after Rupert's demise, Boardman and the Rupert Estate held the same equal shares in the Property and that the Deed's reddendum clause granting Rupert a life estate, transferred "very little" or zero Property ownership interest to Rupert and that "the Executor properly distributed Mr. Rupert's share to his testamentary beneficiaries."

- 2 -

2. Did the Orphans' Court commit an error of law or otherwise abuse its discretion when it found Mr. Rupert was not the tenant in possession of the Property even though the Deed states "Under and subject to the right of John L. Rupert to live in the property for the term of his natural life" and the Agreement of Sale ("AOS") states "JOHN L. RUPERT SHALL ENJOY LIFE RIGHTS TO THE PROPERTY."

3. Did the Orphans' Court commit an error of law or otherwise abuse its discretion when it found any waste of the real Property during occupation and use by deceased Rupert did not incur liability against Rupert and that if any waste did occur then Boardman is as liable as Rupert.

4. Did the Orphans' Court commit an error of law or otherwise abuse its discretion when it found Rupert's personal property was not included in the sale of the property even though the AOS specifically states all personal property of deceased Rupert was included in the sale. The Orphans' Court found the only personal property included in the sale was valueless items scattered about the property.

5. Did the Orphans' Court commit an error of law or otherwise abuse its discretion when it found the Dead Man's Statute applies to Mr. Boardman's testimony and therefore Appellant's relevant testimony should be ignored but then relies on testimony of Appellant concerning matters between the Appellant and the deceased Mr. Rupert, to form conclusions, for example, to conclude Mr. Rupert did not enjoy exclusive possession of the Property due to Mr. Boardman's testimony he visited with Mr. Rupert approximately five times a year.

Appellant's brief at 8-9 (emphasis omitted).

Our standard of review in this matter is as follows:

When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of

that discretion. However, we are not constrained to give the same deference to any resulting legal conclusions. The Orphans' Court decision will not be reversed unless there has been an abuse of discretion or a fundamental error in applying the correct principles of law.

This Court's standard of review of questions of law is *de novo,* and the scope of review is plenary, as we may review the entire record in making our determination. When we review questions of law, our standard of review is limited to determining whether the trial court committed an error of law.

*In re Fiedler*, 132 A.3d 1010, 1018 (Pa.Super. 2016) (citations and quotation marks omitted).

Resolution of Appellant's contentions revolves around the interpretation of two documents and the circumstances surrounding their execution. The first instrument is an agreement of sale dated August 20, 2005. At that time, the real estate was in the joint names of Mr. Rupert, who was elderly and infirm, and his wife, Nancy A. Rupert. The Ruperts were separated, and Mr. Rupert told Appellant, a neighbor, that he wanted to sell her share of the house in order to satisfy her credit card debt. On August 20, 2005, John L. Rupert and Nancy A. Rupert executed an agreement of sale, as sellers, and John L. Rupert and Appellant executed that document, as buyers. In the agreement of sale, Appellant agreed to pay $115,000 for Mrs. Rupert's share of the property. The Ruperts also indicated that the agreement of sale encompassed certain personal property, as follows:

- 4 -

(A) INCLUDED in this sale and purchase price are all existing items permanently installed in the Property free of liens, including plumbing, heating, lighting fixtures (including chandeliers and ceiling fans), water treatment systems, pool and spa equipment, garage door openers and transmitters, television antennas, shrubbery, plantings and unpotted trees, any remaining heating and cooking fuels stored on the Property at the time of settlement, wall to wall carpeting, window covering hardware, shades and blinds, built-in air conditions, built-in appliances, and the range/oven unless otherwise stated. Also included: ALL PERSONAL PROPERTY OF JOHN L. RUPERT.

(B) LEASED items (not owned by Seller):

NONE

(C) EXCLUDED fixtures and items:

TRACTORS, BACKHOE, EXTRANEOUS OTHER EQUIPMENT, TRAILER.

Estate's Exhibit 1 at 2.

The agreement of sale contained an addendum, which set forth that Mr. Rupert, following the sale, would retain "life rights to the property and shall not vacate property upon settlement. Both Buyers shall hold title as tenants in common without rights of survivorship and both parties interest shall become part of their individual estates." *Id*. at Addendum. The Addendum accorded Appellant the right to purchase Mr. Rupert's share of the property, upon Mr. Rupert's death, for $115,000, for a period of six months.

On September 28, 2005, in accordance with the terms of the agreement of sale and addendum, the real estate was deeded by John L.

Rupert and Nancy A. Rupert, as grantors, to "Bryan J. Boardman and John L. Rupert," as grantees and as "tenants in common." Estate's Exhibit 2 at 1. The consideration was $115,000. The grant to Appellant as a tenant in common of the real estate was made, "Under and subject to the right of John L. Rupert to live in the property for the term of his natural life." *Id*. at 2. A corrective deed altering the legal description of the property was executed on October 14, 2005. That deed omitted reference to Mr. Rupert's retention of a life estate in the property, as outlined in the agreement of sale and initial deed.

Although the agreement of sale and initial deed unequivocally set forth that Appellant purchased a one-half interest in the real estate that was subject to Mr. Rupert's life estate, Appellant suggests that he purchased the real estate in its entirety in 2005 rather than a one-half interest.

> When construing a deed, a court's primary object must be to ascertain and effectuate what the parties themselves intended. *Mackall v. Fleegle*, 801 A.2d 577, 581 (Pa.Super. 2002). The traditional rules of construction to determine that intention involve the following principles. First, the nature and quantity of the interest conveyed must be ascertained from the deed itself and cannot be orally shown in the absence of fraud, accident or mistake. *Id*. We seek to ascertain not what the parties may have intended by the language but what is the meaning of the words they used.

*Consolidation Coal Co. v. White*, 875 A.2d 318, 326 (Pa.Super. 2005).

The language of the agreement of sale and deed is not subject to any interpretation other than Appellant purchased a one-half interest in the real

estate and held that interest in the property as a tenant in common with Mr. Rupert. In addition, his one-half share of the property was subject to Mr. Rupert's life estate. Appellant's position is that he must have bought the entire piece of real estate since a one-half interest subject to a life estate was of little or no value whereas he paid the Ruperts $115,000. Appellant, however, did not present an appraisal of the property as of 2005 so that his proposition is unsupported by any proof. While there are pictures of the house, which was dilapidated, in the record, there was no appraisal of the value of acreage in Chadds Ford.

In addition, Appellant did not level any claim that he was defrauded. In the agreement of sale, he assented to the purchase of the interest in the land outlined in the deed for $115,000. Appellant is bound by the terms of his arrangement, even if it represented a poor financial decision. We therefore reject Appellant's first position.

The second averment herein is that Mr. Rupert was obligated to pay Appellant fair rental value during the term of his occupation of the real estate. Since Mr. Rupert allowed two people to park their trailers on the property, Appellant also seeks rental that they paid or owed to Mr. Rupert for exercising that privilege.[1] In resolving this position, the orphans' court

---

[1] It is not clear that the two women who lived in the trailers on the real estate actually paid rent to Mr. Rupert.

observed that Appellant presented no proof of any agreement by Mr. Rupert to pay rent to Appellant while Mr. Rupert lived on the property or that anyone paid rent to Mr. Rupert. It thus denied this claim.

We note the following. Mr. Rupert retained a life estate in the real estate in the agreement of sale and first deed. The corrective deed, which was filed solely to properly describe the land purchased, mistakenly omitted mention of the life estate. It is established that the owner of a life estate is legally entitled to all rental from the property in question during the term of his or her life. *See Guthrie v. Guthrie*, 7 A.2d 137, 139 (Pa.Super. 1939). Mr. Rupert, as life tenant of the real estate, owed Appellant no rental income either himself or from anyone else who resided on the property. Hence, Appellant's second position on appeal lacks merit.

We address together Appellant's third averment, that he was entitled to waste occasioned by Mr. Rupert's occupancy of the real estate, and his fourth contention, that he was entitled to all of Mr. Rupert's personal property under the agreement of sale. We observe that it is established that a claimant against an estate has the burden of proving his claim by direct and positive evidence. *In re Schleich's Estate*, 134 A. 442, 443 (Pa. 1926).

On the issue of waste, the orphans' court made two pertinent factual findings. First: "Insufficient credible evidence was provided for the fair market value of the Property at the time of the August 2005 [agreement of

- 8 -

sale,] Mr. Rupert's death or any other time." Trial Court Opinion, 6/24/15 at ¶ 10. Second: "No credible evidence was presented establishing that Mr. Rupert materially damaged or allowed material damage to the Property, that the condition of the Property had materially deteriorated after the [agreement of sale] was signed, or that the market value of the Property had materially declined as a result of waste from the August 2005 sale until Mr. Rupert's death." *Id*. at ¶ 29.

As to the personal property question, the orphans' court noted: "No credible evidence was presented as to what personal property Mr. Rupert owned in August, 2005 and conveyed in the [agreement of sale]." *Id*. at ¶ 13. It observed that the agreement of sale was a standard one for the purchase of real estate. Thus, when referring to personal property, the agreement's intent most probably was that Mr. Rupert sold his furniture and other tangible personal property in his home to Appellant. In light of the orphans' court's factual findings as to the lack of evidence of waste and the personalty encompassed by the agreement of sale, it is evident that Appellant failed to meet his burden of proof on these two claims. No relief is due.

Finally, after consideration of the facts, briefs, and applicable law, we affirm the orphans' court's application of the Dead Man's Rule on the basis of its June 25, 2015 opinion.

Order affirmed.

Judge Mundy did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/18/2016

**APPENDIX A Orphan's Court DECISION – ORDER June 24th, 2015 by John L. Hall, J.**

C

IN THE COURT OF COMMON PLEAS
CHESTER COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

ESTATE NO. 1513-0131

ESTATE OF JOHN LESLIE RUPERT, a/k/a
JOHN L. RUPERT, DECEASED

DECISION

I.   Procedural Background.

The Estate was opened with the January 23, 2013 Petition for Probate and Grant of Letters Testamentary by Mr. Buckley, Executor. Before the court for decision are the July 28, 2014 Petition for Payment of Claim to Bryan J. Boardman ("Claim"), Bryan J. Boardman's ("Mr. Boardman") August 12, 2014 Petition for Citation: to Show Cause Why an Account Should not be Filed ("Petition for Accounting"), and Mr. Boardman's December 4, 2014 Objections to the Account ("Objections") filed by the Executor, C. Barry Buckley ("Mr. Buckley") in the Estate of John Leslie Rupert ("Estate").[1] This matter is now ripe for a decision.

II.   Issues and Objections.

1.   How was the subject property owned at the time of Mr. Rupert's death?[2]

2.   What personal property, if any, did Mr. Rupert convey in the Agreement of Sale to Mr. Boardman?[3]

---

[1]   The parties agreed that Mr. Boardman could file objections to the October 27, 2014 First and Final Accounting, an informal account ("Account") prepared by Mr. Buckley and provided to Mr. Boardman in lieu of a formal account.
[2]   This issue pertains to Objection 1.
[3]   This issue pertains to Objection 2.

3.    Does the Estate owe Mr. Boardman for rental value of the subject property?[4]

4.    Does the Estate owe Mr. Boardman for waste to the subject property?[5]

III.    **Findings of Fact.**[6]

1.    Decedent John Leslie Rupert, a/k/a John L. Rupert ("Mr. Rupert") died testate on January 11, 2013.

2.    Prior to his death, Mr. Rupert, and his wife, Nancy Rupert ("Mrs. Rupert"), owned an improved parcel of real property located at 137 McFadden Road, Chadds Ford, PA (the "Property") as tenants by the entireties.

3.    Before August 20, 2005, Mr. Rupert informed Mr. Boardman that he was considering a sale of the Property to pay Mrs. Rupert's credit card debt.

4.    On August 20, 2005, Mr. Rupert and Mrs. Rupert entered into an Agreement of Sale ("AOS") with Mr. Boardman which sold Mrs. Rupert's interest in the Property to Mr. Boardman and resulted in the Property being owned by Mr. Rupert and Mr. Boardman as tenants in common.  A condition of the AOS was that Mr. Rupert could reside on the Property for the rest of his life.  (Estate Exhibit 1.)

5.    The AOS lists Mr. Rupert and Mrs. Rupert as the Seller or Sellers, and Mr. Boardman and Mr. Rupert as the Buyer or Buyers.

---

[4]    This issue pertains to Objections 5, 6 and 7.
[5]    This issue pertains to Objections 3 and 4.
[6]    These are the material credible facts found by the court following its review of the evidence presented during the April 8, 2015 hearing.  Any facts described by the court in the Procedural Background and Discussion sections of this Order are incorporated into this Findings of Fact section by reference.

2

6.      At the time of the sale, the Property consisted of an approximately three acre lot improved by a dilapidated house in which Mr. Rupert lived.  At that time, Mrs. Rupert lived elsewhere.

7.      When the AOS was finalized, Mr. Boardman resided in a house on an approximately three-quarter acre lot at 159 McFadden Road, Chadds Ford, PA.  He continues to reside there.  His property is adjacent to the Property.

8.      Mr. Boardman designs radiation monitors and writes software for microcontrollers and personal computers.  At the time of the April 2015 hearing, he was president of an electronics company and held patents for storing solar energy.  He described himself as someone who "turns every stone." [7]

9.      Other than the purchase price of $115,000, and the clause in the AOS permitting Mr. Boardman the option of purchasing Mr. Rupert's share of the Property after his death for an additional $115,000, no credible evidence was presented as to the fair market value of the Property at the time the AOS was entered in August 2005.

10.     Insufficient credible evidence was provided to establish the fair market value of the Property at the time of the August 2005 AOS, Mr. Rupert's death or any other time.

11.     When Mr. Rupert agreed to the AOS, he was physically disabled, in poor health, living alone and unemployed.

12.     The AOS is written on a standard agreement for the sale of real estate approved by the Pennsylvania Association of Realtors.

---

[7]      Mr. Boardman described himself in this manner after the court explored how he produced such lengthy and detailed court filings without any legal education.

3

13. Written at the end of paragraph 4(A) of the AOS, describing all "Fixtures & Personal Property" included in the sale, is the phrase "ALL PERSONAL PROPERTY OF JOHN L. RUPERT." No list or other itemization is provided in the AOS describing what comprised that personal property. No credible evidence was presented as to what personal property Mr. Rupert owned in August, 2005 and conveyed in the AOS.

14. Paragraph 4(C) of the AOS excluded the following personal property from the sale: "tractors, backhoe, extraneous other equipment, trailer."

15. Included at the end of the AOS is an Addendum/Endorsement which Mr. Boardman had inserted into the AOS, which provided:

> "John L. Rupert shall enjoy life rights to the property and shall not vacate property upon settlement. Both buyers shall hold title as tenants in common without rights of survivorship and both parties interest shall become part of their individual estates. Upon the demise of either party, their interest shall become part of their individual estates. Should John L. Rupert pre-decease Mr. Boardman, Mr. Boardman shall have the right to purchase from Mr. Ruperts estate his interest in the property for one hundred fifteen thousand dollars within a period of six months from the time of Mr. Ruperts demise."
> (Estate Exhibit 1.)

16. The AOS states that it consists of the whole agreement between the parties and that any changes to it must be in writing. (Estate Exhibit 1,¶26.)

17. Mr. Boardman paid the initial deposit of $25,000 required by the AOS to Mrs. Rupert. He paid the balance of the $115,000 purchase price ($90,000) at settlement.[8]

18. Settlement on the AOS occurred on September 28, 2005. In accordance with the AOS, the deed ("Deed") provided that Mr. Boardman and Mr. Rupert were the Property grantees, owning as tenants in common. The Deed further provided that the Property was

---

[8] The record does not reflect whether, or how, Mr. Rupert and Mrs. Rupert shared this money.

4

"Under and subject to the right of John L. Rupert to live in the property for the term of his natural life." (Estate Exhibit 2.)

19.     On or about October 14, 2005, a deed of correction ("Deed of Correction") was executed by Mr. Rupert and Mr. Boardman and subsequently filed. (Estate Exhibit 3.) Neither the Deed nor the Deed of Correction defines Mr. Rupert and Mr. Boardman as anything other than "tenants in common." Like the AOS, no fractional ownership interests were indicated in those documents.

20.     A Realty Transfer Tax Statement of Value (the "RTT Form") was signed by Mr. Boardman and was recorded with the Deed. The RTT Form indicated that a 50% interest in the Property was conveyed. (Estate Exhibit 2.)

21.     In accordance with the AOS, Deed and Deed of Correction, after the property settlement, Mr. Rupert and Mr. Boardman owned the Property as tenants in common each holding equal shares to it, with Mr. Rupert having the additional right to live on the Property for the rest of his life.

22.     At some point after the AOS settlement, Mr. Rupert allowed a woman named Hittel Patrice Gimbel ("Ms. Gimbel") and Mrs. Rupert to move residential mobile trailers onto the Property and reside in them. Ms. Gimbel and Mrs. Rupert served as caretakers for Mr. Rupert.

23.     There is no credible evidence that either Mrs. Rupert or Ms. Gimbel had a lease with Mr. Rupert or that either paid any rent to Mr. Rupert for residing on the Property.

24.     There was no credible evidence presented as to the fair rental value of the Property.

5

25.     Mr. Rupert's interest in the Property did not prohibit him from allowing Mrs. Rupert and Ms. Gimbel to move trailers onto the Property and reside there.

26.     Mr. Boardman was aware of the presence of the trailers and that Mrs. Rupert and Ms. Gimbel were residing on the Property, but there was no credible evidence that he sought rent from them or Mr. Rupert.

27.     There is no credible evidence that Ms. Gimbel's or Mrs. Rupert's presence on the Property materially affected Mr. Boardman's rights to the Property as a tenant in common.

28.     Mr. Rupert did not exclusively possess the Property after settlement on the AOS. Mr. Boardman had the ability to access the Property at any time and occasionally visited Mr. Rupert there. Nothing about Mr. Rupert's use of the Property prevented Mr. Boardman from exercising his rights to possess the Property as a tenant in common.

29.     No credible evidence was presented establishing that Mr. Rupert materially damaged or allowed material damage to the Property, that the condition of the Property had materially deteriorated after the AOS was signed, or that the market value of the Property had materially declined as a result of waste from the August 2005 sale until Mr. Rupert's death.

30.     As a tenant in common, Mr. Boardman had the ability and right to maintain the Property and make any necessary repairs to it.

31.     After opening the Estate on January 23, 2013, Mr. Buckley executed and delivered a Fiduciary Warranty Deed ("Executor's Deed") to the testamentary beneficiaries, Ms. Gimbel and Mrs. Rupert on June 23, 2014. The Executor's Deed describes Ms. Gimbel and Mrs. Rupert as grantees of Mr. Rupert's 50% share of the Property.

6

32.    The Executor's Deed was recorded on July 21, 2014 with the Chester County Recorder of Deeds.

33.    Mr. Boardman knew that Mr. Rupert died on January 11, 2013 but chose not to exercise his option under the AOS to purchase Mr. Rupert's interest in the Property for $115,000 within six months of Mr. Rupert's death. Instead, soon after Mr. Rupert's death, Mr. Boardman began repeated contact with Mr. Buckley in an effort to convince him that Mr. Boardman should be provided the entire Property in exchange for Mr. Boardman dropping his waste, rent and personal property demands.

## IV.    Discussion.

### Dead Man's Statute

Preliminarily, this court needs to address the application of the Dead Man's Statute raised by the Estate. Prior to the April 8, 2015 hearing, the Executor filed a Motion in *Limine* ("Motion") on February 25, 2015 seeking a ruling declaring Mr. Boardman incompetent to testify to all matters occurring during the life of Mr. Rupert but for authentication of any contracts. At the hearing, counsel for the Executor renewed the Motion objection as to all matters except for Mr. Boardman's testimony "regarding title to the Property, regarding issues of how the Property was held." (N.T. 4/8/15 at 3-7.)[9] At the hearing, this court deferred ruling on the Motion. Upon consideration of the Motion and review of the law, this court finds the Motion merited and Mr. Boardman incompetent to testify as to those matters prohibited by the Dead Man's Statute, 42 Pa.C.S.A. §5930.

---

[9]    Mr. Boardman unsuccessfully argued that the Estate waived its objection at the hearing. Even if the Estate did waive the Dead Man's Statute, the court finds all of Mr. Boardman's testimony in material opposition to the Estate not credible.

7

The Dead Man's Rule, also known as the Dead Man's Statute or the Dead Man's Act, "provides an exception to the general rule of competency and disqualifies surviving parties to a transaction or event who have an interest adverse to the decedent from testifying as to matters which occurred prior to the decedent's death." *Estate of Kofsky*, 487 Pa. 473, 475, 409 A.2d 1358, 1359 (1979). This exception applies to any matter or fact occurring prior to the decedent's death. *See Schroeder v. Jacquiss*, 861 A.2d 885, 887 (Pa. 2004); *see also Estate of Petro*, 694 A.2d 627 (Pa. Super. 1997); *Estate of Cecchine*, 336 Pa.Super 111, 485 A.2d 454 (1984). However, the Dead Man's Rule does not apply to written documents signed by the decedent prior to his/her death. *Larken v. Metz*, 398 Pa.Super. 235, 242, 580 A.2d 1150, 1153 (1990).

Three conditions must exist before the surviving party or witness is disqualified under the Dead Man's Act: "the deceased must have had an actual right or interest in the matter at issue, *i.e.* an interest in the immediate result of the suit; (2) the interest of the witness – not simply the testimony – must be adverse; (3) a right of the deceased must have passed to a party of record who represents the deceased's interests." *Id.* at 240, 580 A.2d 1150, 1152, *quoting In Re: Hendrickson's Estate*, 338 Pa. 39, 45, 130 A.2d 143, 146-147 (1957); *see also In Re: Rider's Estate*, 487 Pa. 373, 377, 409 A.2d 397, 399 (1979). The burden of proving the incompetency is on the party challenging competency. *Id.*

There are three exceptions to the application of this rule: (1) an action involving surviving partners or joint promisors; (2) possessory actions in which one of the defendants disclaims and pays costs into the court or gives security; and (3) where the controversy over the property of the decedent is between parties respectively claiming such property "by devolution on the death of the owner." (*devisavit vel non*). This applies to situations in which the decedent's property passes by will or intestacy. *See Estate of Janosky*, 827 A.2d 512, 516 (Pa.Super. 2003).

8

Applying the law to the case *sub judice*, this court finds that the Dead Man's Statute is applicable. Here, Mr. Rupert had an interest and a right in the property per the AOS and the Deed. The interest of Mr. Boardman is clearly adverse to Mr. Rupert. Mr. Boardman seeks damages/monies allegedly resulting from Mr. Rupert's actions and Mr. Rupert's rights have passed to his Estate. The Estate timely and properly raised the objection to Mr. Boardman's testimony.

Furthermore, as stated above in footnote 6, even if this court's application of the Dead Man's Statute is in error and Mr. Boardman were competent to testify, this court finds that Mr. Boardman is not credible in any of his testimony which is adverse to the Estate. Consequently, such error would be harmless. In light of Mr. Boardman's lack of admissible and credible evidence, he has failed to establish and prove his Claim against the Estate by clear, direct, precise and convincing evidence. *Estate of Allen*, 488 Pa. 415, 412 A.2d 833 (1980).

 *1. How was the subject property owned at the time of Mr. Rupert's death?*

The AOS (Estate Exhibit 1) was executed on August 20, 2005 and provided for a transfer of the Property from John and Nancy Rupert, as Sellers, to John Rupert and Bryan Boardman, as Buyers. The Addendum/Endorsement to the AOS provided: (1) Mr. Rupert the right to live on the Property for his life; (2) Buyers (Mr. Rupert and Mr. Boardman) to hold title as tenants in common without rights of survivorship and for both parties' interest to become part of their individual estates; and (3) Mr. Boardman the right to purchase from Mr. Rupert's estate his interest in the Property for $115,000 within six months following Mr. Rupert's death. Mr. Boardman argues that his interest is superior to Mr. Rupert's because he made a "superior

9

contribution to the purchase price" and that he purchased Mr. and Mrs. Rupert's entire interest in the Property.

The court rejects Mr. Boardman's arguments. The credible evidence establishes that Mrs. Rupert's half interest in the Property was purchased by Mr. Boardman for an amount which the parties contemplated would be equal to Mr. Rupert's half interest at his death. Consistent with the court's conclusion and contrary to Mr. Boardman's position, the Deed equally listed both Mr. Boardman and Mr. Rupert as tenants in common. Where "[t]he language of a deed is clear [and] unambiguous [, . . .] the intent of the grantees must be gleaned solely from its language. . . . In the absence of fraud, accident or mistake parol evidence is inadmissible to vary or limit the scope of a deed's express covenants and the nature and quantity of the interest conveyed must be ascertained by the instrument itself and cannot be orally shown: . . ." *Moore v. Miller*, 910 A.2d 704, 708 (Pa.Super. 2006) quoting *Teacher v. Kijurina*, 365 Pa. 480, 486, 76 A.2d 197 199 (1950). Here, there was no credible evidence of fraud, accident or mistake.

Neither the Deed nor Deed of Correction specify the percentages of the Property owned by each tenant in common. Rather, they indicate only that Mr. Rupert and Mr. Boardman have equal status as tenants in common. This is consistent with the terms of the AOS. In accordance with its own terms (AOS, ¶26) and contract law, the AOS cannot be changed by oral testimony. Where a contract "is clear and unequivocal, its meaning must be determined by its contents alone." *Welrath v. Harvey*, 912 A.2d 863, 866 (Pa.Super. 2006). It is presumed that, unless stated otherwise, the ownership interest is equal. The amount of money contributed by one of the owners in the purchase of real property does not dictate the percentage of ownership. *Moore v. Miller*, 910 A.2d at 709. Additionally, the amount paid by Mr. Boardman, as contrasted with

10

the identical amount he had the option to pay for the entire Property ownership, is consistent with a conclusion that he only purchased a half interest in the Property.

This court finds Mr. Boardman's testimony to the contrary not credible. If the parties had agreed that Mr. Boardman's interest was superior to Mr. Rupert's then the AOS and Deed would have so indicated. They did not. The credible evidence supports the conclusion that Mr. Boardman purchased Mrs. Rupert's half of the Property for $115,000 while Mr. Rupert retained his half. Mr. Boardman's testimony that the key clause in the AOS, which described his option to purchase Mr. Rupert's interest at his death, could have included any amount other than $115,000, like the rest of his self-serving testimony, is not credible.[10] Accordingly, the court has found as a fact that Mr. Boardman purchased Mrs. Rupert's interest in the Property and that Mr. Boardman and Mr. Rupert owned the Property as tenants in common in equal shares. Following Mr. Rupert's death, Mr. Boardman did not purchase Mr. Rupert's interest, and in accordance with Mr. Rupert's will, the Executor properly distributed Mr. Rupert's share to his testamentary beneficiaries.

2.   *What personal property, if any, did Mr. Rupert convey in the Agreement of Sale to Mr. Boardman?*

The Ruperts and Mr. Boardman utilized a fill-in-the-blank standard agreement for the sale of real estate in conveying the Property from the Ruperts to Mr. Boardman and Mr. Rupert as tenants in common. Paragraph 4 of the real estate AOS provides as follows:

4.   FIXTURES & PERSONAL PROPERTY (I-00)

---

[10]   For the court to believe Mr. Boardman did not intend and agree to pay $115,000 for Mr. Rupert's share of the Property, it would have to believe that he, according to his own description, turned every stone except this important one in a clause that he had included in the AOS. (N.T. 4/8/15 at 14-15.)

11

(A)    INCLUDED in this sale and purchase price are all existing items permanently installed in the Property free of liens, including plumbing, heating, lighting fixtures (including chandeliers and ceiling fans), water treatment systems, pool and spa equipment, garage door openers and transmitters, television antennas, shrubbery, plantings and unpotted trees, any remaining heating and cooking fuels stored on the Property at the time of settlement, wall to wall carpeting, window covering hardware, shades and blinds, built-in air conditions, built-in appliances, and the range/oven unless otherwise stated.  Also included:  ALL PERSONAL PROPERTY OF JOHN L. RUPERT.

(B) LEASED items (not owned by Seller):
NONE

(C) EXCLUDED fixtures and items:
TRACTORS, BACKHOE, EXTRANEOUS OTHER EQUIPMENT, TRAILER

This clause is a standard real estate agreement "fixture clause."

Clauses explaining the transfer of personal property that had been affixed to the real property were included in agreements in former times.  Today, fixture clauses may be included in the section of the agreement that explain which personal property, if any, is being transferred to the buyer as part of the transaction.  Fixtures, having become part of the real estate, are included in the sale unless specifically excluded.
1 Ladner Pennsylvania Real Estate Law §14.04(f) (Ronald M. Friedman, ed., George T. Bisel Company, Inc. 6th ed. 2013).

In addition to this clause, paragraph 26(B) of the AOS represents that Mr. Boardman, as Buyer, had inspected all fixtures and personal property specifically scheduled within the AOS or waived the right to do so.

In the context of an AOS of real estate and the location of the phrase "ALL PERSONAL PROPERTY OF JOHN L. RUPERT" under paragraph 4(a), it is evident to this court that the parties were referencing tangible personal property attached to or used on the real property itself. Even if this phrase were to be considered ambiguous and extraneous evidence were considered, there is no credible evidence as to what other personal property was conveyed by Mr. Rupert to

12

Mr. Boardman beyond that attached to or, as described by AOS ¶4(A), "installed in" the Property. Although the parties included a list of excluded tangible personal property, no such list of included Property was provided. In accordance with the AOS, Mr. Boardman had the right to inspect the included personal property but there is no credible evidence that he viewed anything other than the Property. This court declines to construe this phrase to mean all of Mr. Rupert's personal property, including the bank accounts and stocks which Mr. Boardman now seeks, located anywhere in the world with which he died seized some nine years after the AOS.

3.      *Does the Estate owe Mr. Boardman for rental value of the subject property?*

Mr. Boardman argues he is owed the rental value of the Property for Mr. Rupert's occupancy until Mr. Rupert died. This court finds this claim to be meritless and looks to the AOS and the Deed, neither of which require, nor even mention, rent. Mr. Rupert was a tenant in common with the right to live on the Property for his life. Pursuant to the AOS, (¶3(b)), Mr. Rupert was obligated to pay the property taxes but nothing else. If Mr. Rupert was obligated to pay rent to Mr. Boardman, for his occupancy, or the occupancy of others, the AOS would have stated as such. This court may not add a new term to the AOS.[11]

Mr. Boardman's allegation that Mr. Rupert had exclusive possession of the Property because he was permitted to live there for the rest of his life does not equate to a duty to pay rent. Consistent with the court's rejection that Mr. Rupert had exclusive possession of the Property, generally, each tenant in common is deemed to hold an undivided right of possession, allowing

---

[11]     *See The York Group, Inc. v. Yorktown Caskets, Inc.*, 924 A.2d 1234, 1247 (Pa.Super. 2007) (". . . writing constitutes the agreement between the parties, and its terms and agreements cannot be added to or subtracted from by parol evidence." (citations omitted) *See also Welroth v. Harvey*, 912 A.2d at 866.

13

each to occupy the whole in common with the other tenants in common. *See Estate of Engel,* 413 Pa. 475, 478, 198 A.2d 505, 507 (1964) (well established that tenants in common "own and possess in equal shares an undivided interest in the whole property.") *See generally* 86 C.J.S. Tenancy in Common §§1-3. That Mr. Rupert had his right to possession extended through his lifetime provided him very little rights that he did not otherwise own as a tenant in common. This additional right might only have provided him a material benefit if, in response to a partition action, he had sought to remain on the Property as a life tenant. Pa.R.C.P. 1564. No such action was ever instituted. Moreover, outside the context of partition, even if Mr. Rupert were deemed to have exclusive possession, such possession was implicitly agreed to by Mr. Boardman, and neither the AOS, the Deed, the Deed of Correction nor any credible evidence supports a duty by Mr. Rupert to pay rent. Consequently, rent cannot now be claimed against Mr. Rupert's Estate.

Lastly, as a tenant in common owner, Mr. Rupert was permitted to allow Ms. Gimbel and Mrs. Rupert to live with him, and care for him, on the Property. There is no credible evidence that they paid Mr. Rupert any rent, that their presence created a duty of rent payment by Mr. Rupert to Mr. Boardman, or adversely affected any of Mr. Boardman's rights as a tenant in common. Even if rent were somehow owed, there is no credible evidence as to any rental value.

4.    *Does the Estate owe Mr. Boardman for waste to the subject property?*

In his Objections, Mr. Boardman asserts that he is owed money damages for waste allegedly committed by Mr. Rupert and that he is entitled to the costs of restoration of the Property to a vacant lot. Even if the Objections could be construed to be a properly instituted action for waste, Mr. Boardman has not met his burden of proving by a preponderance of the

evidence that Mr. Rupert committed waste as to the Property. *See Morris v. Knight*, 14 Pa.Super. 324 (1900). All of Mr. Boardman's testimony on this issue was excluded by the Dead Man's Statute and even if permitted, was not credible.

The only credible evidence as to the market value of the Property in 2005 is the fact that Mr. Boardman purchased Mrs. Rupert's interest in the Property for $115,000 and agreed to pay, if he chose to purchase, an additional $115,000 for Mr. Rupert's interest after Mr. Rupert's death. There was no evidence, other than Mr. Boardman's inadmissible and self-serving testimony, establishing the condition of the Property in 2005. Furthermore, as a tenant in common, Mr. Boardman had as much right as Mr. Rupert to maintain and make repairs to the Property. Generally, co-tenants in common have a right and an equal duty to make repairs to the common property. *See generally* 86 C.J.S. Tenancy in Common §86. There is no evidence that Mr. Rupert ever denied his neighbor, Mr. Boardman, access to the Property. Indeed Mr. Boardman often entered onto the Property. Consequently, the allegation that Mr. Rupert owed money to Mr. Boardman for waste is unproven.

15

## O R D E R

AND NOW, this 24th day of June, 2015, following consideration of the evidence adduced during the April 8, 2015 hearing, it is hereby **ORDERED** and **DECREED** that the Claim and Objections are **DENIED** and **OVERRULED** as meritless, the Petition for Accounting is **DENIED** as moot[12] and the Motion is **GRANTED**.[13]

BY THE COURT:

_____
John L. Hall, J.

---

[12]  The parties agreed that the Estate could file the informal Account to which Mr. Boardman could file his Objections.

[13]  The court is left with the distinct impression that Mr. Boardman has been contemplating and crafting his arguments to acquire Mr. Rupert's share of the Property long before Mr. Rupert died. His efforts to utilize his well thought out positions to his advantage began soon after Mr. Rupert's death and continued unabated until the court declined his request to provide a third post hearing brief. Mr. Boardman is well aware that any expense by the Estate's attorney to respond to his arguments, documents and filings extract legal fees from the Estate which otherwise could be provided to the Estate beneficiaries. When combined with his wholly incredible testimony, the court is left with the impression of an unscrupulous person who long sought to take advantage of Mr. Rupert's estate prior to Mr. Rupert's death and immediately put his plan into motion once Mr. Rupert's death silenced his ability to protect his property. Although the court has not been requested and does not intend to award attorney's fees against Mr. Boardman for pursuing his Claim and Objections in this forum, if he appeals this Order, the court may determine that he is acting in bad faith and request the Superior Court to consider an award of attorney's fees against him pursuant to Pa.R.A.P. 2744.

16

**APPENDIX C - Orphan's Court October 28, 2015 MEMORANDUM OPINION**

IN THE COURT OF COMMON PLEAS
CHESTER COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

ESTATE NO. 1513-0131

ESTATE OF JOHN LESLIE RUPERT, a/k/a
JOHN L. RUPERT, DECEASED

(2924 EDA 2015)

## MEMORANDUM OPINION

### Procedural History

Bryan J. Boardman ("Mr. Boardman") has appealed this court's June 25, 2015 Order ("Order") which overruled Mr. Boardman's July 28, 2014 Petition for Payment of Claim and his December 4, 2014 Objections ("Objections") to the informal account[1] filed by the executor for the Estate of John Leslie Rupert ("Estate"). On July 15, 2015, Mr. Boardman filed Exceptions to the Order. The court denied the Exceptions by order dated August 21, 2015. Thereafter, on September 18, 2015, Mr. Boardman filed this appeal. On October 8, 2015, Mr. Boardman filed a statement of errors complained of on appeal ("Statement").[2]

The following five alleged errors are described within the Statement:

---

[1] The parties agreed that the Estate would file an informal account to which Mr. Boardman could file his Objections.

[2] Although the court issued an order requiring Mr. Boardman to file a *concise* statement, in fact Mr. Boardman's twenty-four (24) page document is neither concise nor even labeled "concise." This filing is in clear violation of Pa.R.A.P. 1925(b)(4)(ii) and (iv). *Kanter v. Epstein*, 866 A.2d 394, 400-402 (Pa. Super. 2004). As explained in footnote 13 of the June 25, 2015 Decision ("Decision") attached to the Order, Mr. Boardman is well aware that his many and massive filings cause an unnecessary drain on this relatively small estate, leaving ever less for the estate beneficiaries. After the issuance of the Decision, that pattern of conduct has continued. Prior to his filing of the Statement, Mr. Boardman filed forty-five (45) pages of meritless Exceptions. This court continues to question whether he is acting in bad faith.

"1.      Property Ownership. The court found Mr. Rupert and Mr. Boardman owned the property as tenants in common each holding equal shares to it. In this finding the court erred."

"2.      Waste of Property. The court found Mr. Rupert's estate is not liable for waste of the property. In this finding the court erred."

"3.      Rent of Property. The court found Mr. Rupert's estate is not liable for rental value of the property during co-ownership with Mr. Boardman. In this finding the court erred."

"4.      Personal Property. The court found Mr. Rupert's estate is not liable to Mr. Boardman for Mr. Rupert's personal property. In this finding the court erred."

"5.      Dead Man's Statute. The court found that Rupert estate's Motion to apply the Dead Man's Statute is carried. In this finding the court erred."

The Decision (a copy of which is attached hereto with the Order) largely addresses the alleged errors. The following supplement is included to further explain the reasons for the court's rulings and to satisfy the mandate of Pa.R.A.P. 1925(a).


**Alleged Error No. 1**

"1.      Property Ownership. The court found Mr. Rupert and Mr. Boardman owned the property as tenants in common each holding equal shares to it. In this finding the court erred."

Mr. Boardman's claim that he purchased "essentially one hundred percent" (N.T. 4/8/15, at 17, 22, 71, 84 and 86) of the real property ("Property") owned by decedent John Leslie Rupert ("Mr. Rupert") and his wife, Nancy Rupert ("Mrs. Rupert") because he made a "superior contribution to the purchase price" (Statement, pp. 1 and 6) is supported neither by the credible evidence nor law. Finding of fact 4 in the Decision, which Mr. Boardman failed to

2

contest within his Exceptions, specifically found that the Mr. Rupert and Mrs. Rupert "entered into an agreement of sale ('AOS') with Mr. Boardman which sold Mrs. Rupert's interest in the Property to Mr. Boardman. . . ." Even if Mr. Boardman has preserved an objection to this finding, the finding is supported by the record evidence.

At the time of the AOS, Mr. Rupert already owned the Property. It is hardly surprising that he did not pay the consideration to purchase it. The only monies paid came, and logically would come, from the new tenant in common, Mr. Boardman. Therefore, even if Mr. Boardman's legal theory of superior contribution to the purchase price were valid, which it is not, it would necessarily fail. He paid for a half interest and that is what he got. The price paid by Mr. Boardman supports this conclusion. The AOS required Mr. Boardman to pay $115,000 for Mrs. Rupert's half interest in the Property. It further allowed him the option to buy Mr. Rupert's half interest after Mr. Rupert's death for an identical $115,000 amount. (Estate Exhibit 1, pp. 1 and 23.)[3]

As to the important option clause contained within the AOS (Estate Exhibit 1, p. 23), the record belies Mr. Boardman's claim that he did not knowingly place that provision in the AOS (Statement, p. 4). During the hearing, Mr. Boardman asserted that he "had that [the option clause] included in the sales agreement. . . ." (N.T. 4/8/15, at 14.) Shortly thereafter, when asked why he had the clause put into the AOS, Mr. Boardman provided a wholly incredible response, but did not deny that he had the clause inserted. (N.T. 4/8/15, at 15.) It

---

[3] These values imply that the parties valued the Property for a total amount of approximately $230,000. Within his Exceptions, Mr. Boardman argued that at the time of the 2005 AOS, the fair market value of the Property was close to this figure. He arrived at that figure by using the Chester County assessed value for the Property multiplied by the common level ratio factor. (Exceptions, p. 12.) Although the court did not find sufficient credible evidence to conclude as a fact that this calculated value, approximately $210,000, was the 2005 fair market value of the Property, Mr. Boardman's argument, which he repeats in the Statement, (p. 12), is consistent with the court's determination that Mr. Boardman only purchased Mrs. Rupert's half interest in the Property, and thereafter equally shared the Property with Mr. Rupert as tenants in common.

3

was only later in his testimony that he attempted to distance himself from the option purchase price, stating that he did not think he came up with the $115,000 figure. (N.T. 4/8/15, at 15-16.) The court did not believe that testimony.[4] The court, as trier of fact, is free to believe all, part or none of the evidence that is presented and to resolve any conflict in the evidence. *Stokes v. Gary Barbera Enterprises, Inc.,* 783 A.2d 296, 297 (Pa. Super. 2001), *appeal denied,* 568 Pa. 23, 797 A.2d 915 (2002). The trial court is "free to reject even uncontradicted evidence that it finds lacking in credibility." *Boro Construction, Inc. v. Ridley School District,* 992 A.2d 208, 218 n.16 (Pa.Cmwlth. 2010), *citing D'Emilio v. Board of Supervisors of the Township of Bensalem,* 157 Pa.Cmwlth. 64, 628 A.2d 1230 (1993).

In any event, as explained in the Decision, the amount of money contributed by one of the owners in the purchase of real estate does not dictate the percentage of ownership. It is presumed that, unless stated otherwise, the ownership interest is equal. *Moore v. Miller,* 910 A.2d 704, 708 (Pa. Super. 2006). Contrary to Mr. Boardman's proffered legal theory, this is the law which controls this issue. The credible evidence did not rebut the presumption described within *Moore.*

### Alleged Error No. 2

"2.     Waste of Property. The court found Mr. Rupert's estate is not liable for waste of the property. In this finding the court erred."

---

[4]     Although Mr. Boardman hedged on the purchase amount, he did not at that time deny he had the option clause included in the AOS. Even if the $115,000 figure were randomly picked, as unpersuasively implied by Mr. Boardman, the balance of that clause also supports the court's conclusion of equal ownership. When he inserted the clause in the AOS, Mr. Boardman chose not to define Mr. Rupert's interest as any less than his own, and specified that each of them held as tenants in common with their interests eventually flowing to their individual estates.

4

As described within the Decision, Mr. Boardman did not carry his burden of proving that the Estate owes him damages for waste. When purchased by Mr. Boardman, the house located on the Property was dilapidated and in poor condition (N.T. 4/8/15, at 87-88). At the time of the purchase, Mr. Rupert, the Property occupant, was so physically disabled[5] that it was very difficult for him to walk, he was unable to shop and he was unemployed. (N.T. 4/8/15, at 52-53.) In fact, Mr. Boardman did not think Mr. Rupert had long to live. (N.T. 4/8/15, at 22.) After the purchase, as a co-tenant in common, Mr. Boardman held an equal right of possession to the Property, *Estate of Engel*, 413 Pa. 475, 478, 198 A.2d 505, 507 (1964), as well as an equal right and duty to make repairs to it. 86 C.J.S. Tenancy in Common §86. No credible evidence was presented that Mr. Rupert ever denied Mr. Boardman access to the Property and in fact Mr. Boardman, as an adjacent landowner and purported friend of Mr. Rupert, often entered onto the Property and had continuous opportunities to observe, inspect and repair the house. No credible evidence was offered that the parties ever discussed how repairs and maintenance for the Property would be shared. Mr. Boardman's decision to wait until after Mr. Rupert's death to claim that Mr. Rupert alone was obligated to repair the Property is legally unsupportable, and further appears, on its face, to be unconscionable.

In any event, Mr. Boardman's testimony in opposition to the Estate was properly excluded by the court pursuant to the Dead Man's Statute and even if admitted, was not credible. Consequently, there was no credible evidence that waste occurred, that Mr. Rupert was responsible alone to avoid waste, or what damages should be awarded even if waste were proven. Mr. Boardman's invocation of partition law is equally unpersuasive. Mr. Boardman never instituted a partition action against Mr. Rupert. Mr. Boardman cannot now claim the application of partition law remedies in this account proceeding. The use of a master for

---

[5] Mr. Boardman described him as "crippled." (N.T. 4/8/15, at 52.)

5

example, is a partition, not an account adjudication procedure. Mr. Boardman never requested a master and therefore waived that right, even if it existed.

### Alleged Error No. 3

"3.      Rent of Property. The court found Mr. Rupert's estate is not liable for rental value of the property during co-ownership with Mr. Boardman. In this finding the court erred."

Mr. Boardman's claim for rent against the Estate is unpersuasive for a number of reasons. Fundamentally, there is no record evidence that Mr. Boardman and Mr. Rupert ever agreed that Mr. Rupert would pay rent. In fact, the record evidence, as described within the AOS and Property deed, (Estate Exhibit 2), implies that the parties contemplated the right of Mr. Rupert to live on *his* Property without payment of rent. Mr. Rupert's only agreed upon ongoing monetary requirement was to pay the Property taxes (Estate Exhibit 1, p. 2). Furthermore, like Mr. Boardman's waste argument, his exclusive possession argument rests on partition law. Even if exclusive possession were proven, which it was not, this is not a partition action. As previously stated, Mr. Boardman's post-hearing suggestion that a partition master should have been appointed is similarly without merit or waived.

Mr. Boardman and Mr. Rupert were co-tenants, deemed to each hold an undivided right of possession in the Property. Each had a right to occupy the whole in common with the other. *Estate of Engle*, 413 Pa. at 478, 198 A.2d at 507. That Mr. Rupert was provided the right to live on the Property for his lifetime, did not exclude Mr. Boardman from sharing occupancy. No evidence was presented, credible or not, which even suggested Mr. Boardman had a desire to occupy the Property, including that part of the Property eventually occupied by Mrs. Rupert

6

and Hittel Patrice Gimbel ("Ms. Gimbel"). Although Mr. Boardman knew that Mrs. Rupert and Ms. Gimbel resided on the Property to care for Mr. Rupert, there is no record evidence that Mr. Boardman ever sought to eject them or ask them to pay rent. Indeed, Mr. Boardman declared at the hearing that they do not owe him rent (N.T. 4/8/15, at 26). Furthermore, the law does not prevent a property owner in need of care from inviting guests to live with and care for him.

Ultimately, there are no credible facts of record to support Mr. Boardman's claim of rent. His many allegations of fact *dehors* the record within his Statement cannot change that circumstance. The AOS required Mr. Rupert to pay only taxes during his occupancy. No written evidence of a lease or other requirement to pay rent was presented. No evidence was presented that Mr. Rupert required or collected rent from Mrs. Rupert or Ms. Gimbel. No evidence was presented establishing rent damages, as apparently acknowledged by Mr. Boardman. (*See* Statement, p. 16.) Consequently, the court did not err when it refused to award Mr. Boardman rental damages.

### Alleged Error No. 4

"4.     Personal Property. The court found Mr. Rupert's estate is not liable to Mr.

Boardman for Mr. Rupert's personal property. In this finding the court erred."

No error was caused by the court when it determined that the personal property included in the AOS consisted of personal property attached to or used on the Property itself. On this issue, Mr. Boardman's testimony, including his testimony that Mr. Rupert intended to provide him with all of his personal property anywhere in the world due to Mr. Rupert's "sentiment

7

towards and friendship with" him, was excluded by the court, and even if considered, was not credible.

Mr. Boardman's lack of credibility on this issue is disturbingly apparent. For example, Mr. Boardman outrageously suggests in his Statement (p. 20) that the personal property he purchased from Mr. Rupert included 50% of the $115,000 (or $57,500) consideration that Mr. Boardman paid at settlement. Essentially, Mr. Boardman suggests that he continues to own half of the money he paid to the Ruperts. But the logical conclusion of this suggestion is that the $57,500 in personal property he allegedly purchased from Mr. Rupert at the execution of the AOS did not even exist at that time among Mr. Rupert's assets. Instead, at the time the AOS was executed in August, 2005, the money was Mr. Boardman's personal property, or that of his lending institution. Second, there was no credible evidence presented that Mr. Rupert even received $57,500 from the transaction. Mrs. Rupert could well have received all of the consideration. Third, even if Mr. Rupert received $57,500 of the $115,000 purchase price, it makes no sense that Mr. Rupert would have contracted to give it back to Mr. Boardman via the fixtures and personal property clause of the AOS. If he did, Mr. Rupert, in effect, would have become a bailee of the $57,500, holding it for Mr. Boardman and without authority to use it. Fourth, if the parties had actually intended in the AOS for Mr. Boardman to buy back *his own* $57,500 as part of Mr. Rupert's "personal property", they would simply have listed the total sales price as $57,500, rather than $115,000, and paid half of the taxes. This argument is really beyond the pale and says much about Mr. Boardman. [6]

Further, Mr. Boardman alternatively acknowledges that he did not even know what Mr. Rupert's personal property consisted of, other than that which Mr. Boardman had observed on the Property itself. His ongoing post-hearing suggestion of a master, in this instance to

---

[6]    It also supports the bad faith referenced in footnote 2.

8

determine the existence of such other personal property, confirms this lack of knowledge. (Statement, p. 20.) Certainly the only personal property that Mr. Boardman purportedly inspected, pursuant to paragraph 26(B) of the AOS, was on the Property.

Additionally, as described within the Decision, the only examples of "fixtures and personal property," described within paragraph 4 of the AOS, were tangible personal property attached to or used on the Property. Contrary to Mr. Boardman's representation within his Statement, those items include personal property which are not fixtures.[7] Paragraph 4(A) of the AOS includes "pool and spa equipment", for example, which could include removable pool covers, skimmers and the like, while garage door "transmitters" are normally portable devices carried within motor vehicles garaged on the subject real estate. The Pennsylvania Supreme Court has specifically defined "chandeliers" as personal property which, even when attached to a dwelling, are not fixtures. *Holthouse v. Rynd*, 155 Pa. 43, 25 A. 760 (1893); *Vaughen v. Haldeman*, 33 Pa. 522 (1859). Tellingly, when Mr. Boardman and Mr. Rupert listed items to be excluded under the fixtures and personal property clause, they only included personal property, not fixtures, used on the Property, i.e. "tractors, backhoe, extraneous other equipment, trailer." (Estate Exhibit 1, p. 2, ¶4(C)).

Finally, even if the court erred, the error is harmless. Mr. Boardman failed to prove what other personal property Mr. Rupert owned at the time the AOS was executed. Like his failure to prove damages related to waste and rent, the record is void of credible evidence defining the type and value of personal property owned in 2005 by Mr. Rupert which was not attached to or used on the Property. As previously described, Mr. Boardman appears to concede this deficiency.

---

[7] Fixtures are usually defined as items permanently affixed to and which have become part of the real estate. *Clayton v. Lienhard*, 312 Pa. 433, 435-437, 167 A. 321, 322 (1933).

9

## Alleged Error Number 5

"5.     Dead Man's Statute.  The court found that Rupert estate's motion to apply the

Dead Man's Statute is carried.  In this finding the court erred."

The only issue concerning the Dead Man's Statute that was preserved on appeal by Mr.

Boardman was that of waiver by the Estate, caused by the Estate's counsel cross examination

of Mr. Boardman at the April 8, 2015 hearing.  Mr. Boardman ignores the fact that counsel for

the Estate raised and preserved the issue of the Dead Man's Statute in the Estate's February 25,

2015 Motion in *Limine* ("Motion").  At the April 8, 2015 hearing, the Estate continued to assert

the Statute.  In response, this court deferred ruling on the Motion, thereby compelling the

Estate's attorney, properly, to cross examine Mr. Boardman in case the Motion were denied.

There is no waiver of the Dead Man's Statute where the trial judge "expressly reserved the

right to pass on the questions legitimately arising under the objection when he came to the final

decision of the case. . . ." *DeSilver's Estate*, 32 Pa. Super. 174 (1906).  Consequently, this

court correctly found that "[t]he Estate timely and properly raised the objection to Mr.

Boardman's testimony." (Decision at p. 9.)

Additionally, no prejudice to Mr. Boardman resulted from the Estate's cross

examination.  Mr. Boardman also had the opportunity to testify fully in his own direct

testimony.  When the court eventually applied the Dead Man's Statute, it excluded all material

answers, whether provided on direct or cross, which were in violation of the Statute.  Lastly, as

previously described, even if the Dead Man's Statute is inapplicable and Mr. Boardman's

testimony considered by the court, he was simply not credible in opposing the interests of Mr.

Rupert and his Estate.  Much of his testimony was self-serving, improbable and unsupported by

the written documentation.

10

## Conclusion

Accordingly, it is respectfully suggested that the Order be affirmed.

BY THE COURT:

October 28, 2015
Date

John L. Hall, J.

11